*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-TX-0820

LHL REALTY COMPANY DC LLC, *et al.*, APPELLANTS,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2020-CVT-000002)

(Carmen G. McLean, *Judge*)

(Argued May 7, 2025                                   Decided June 11, 2026)

*Stephanie A. Lipinski Galland*, with whom *Kyle Wingfield*, *Sonia Shaikh*, and *Matthew L. Devendorf* were on the briefs, for appellants.

*Marcella Coburn*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Graham E. Phillips* and *Carl J. Schifferle*, Deputy Solicitors General, *Richard S. Love*, Senior Assistant Attorney General, and *Jeremy R. Girton*, Assistant Attorney General, were on the briefs, for appellee.

*Elbert Lin*, *Erica N. Peterson*, *Maria C. Monaghan*, and *Christopher J. Walker* filed a brief on behalf of *Chamber of Commerce of the United States of America* as *amicus curiae*.

*John J. Vecchione* and *Mark S. Chenoweth* filed a brief on behalf of *New Civil Liberties Alliance* as *amicus curiae*.

*Jonathan H. Levy* and *Fran Swanson* filed a brief on behalf of *Legal Aid DC* as *amicus curiae*.

Before McLeese, Deahl, and Howard, *Associate Judges*.

McLeese, *Associate Judge*: Appellants LHL Realty Company DC LLC (the LLC) and LHL Realty Company (the Partnership), which we refer to collectively as LHL, appeal from the Superior Court's grant of summary judgment to appellee the District of Columbia on the ground that a transfer of real property from the Partnership to the LLC was a taxable event. We affirm the trial court's ruling.

## I. Factual and Legal Background

A transfer of real property in the District of Columbia generally triggers an obligation to pay recordation and transfer taxes. D.C. Code §§ 42-1103(a)(1) (recordation tax), 47-903(a)(1) (transfer tax). The taxes are payable upon recordation of the deed or other transfer document with the Recorder of Deeds (ROD). D.C. Code §§ 47-1431(a) (duty to record with ROD), 42-1103(a)(1) (recordation tax), 47-903(a)(1) (transfer tax). Recordation must occur "[w]ithin 30 days after the execution of a deed or other document by which legal title to real property . . . is transferred." D.C. Code § 47-1431(a). The amount of the tax is based on the amount of consideration paid or required to be paid for the property. D.C. Code §§ 42-1103(a)(1)(A) (recordation tax of 1.1 percent of consideration), 47-903(a)(1) (transfer tax of 1.1 percent of consideration), 42-1101(5) (defining "consideration"),

47-901(5) (same). If no or nominal consideration is paid or required to be paid for the real property, however, "the tax shall be based upon the fair market value" of the property. D.C. Code § 42-1104(a) (recordation tax); *see id.* § 47-904 (transfer tax).

It is "presumed that all transfers of real property are taxable and the burden shall be upon the taxpayer to show that a transfer is exempt from tax." D.C. Code § 47-907 (transfer tax); *see id.* § 42-1107 (recordation tax). Transfers of real property that occur as part of a merger are taxable. 9 D.C.M.R. § 502.1a (recordation tax); *Vornado 3040 M St. LLC v. District of Columbia*, 318 A.3d 1185, 1190-91 (D.C. 2024) (recordation and transfer taxes). Transfers that occur as part of a conversion are exempt from both recordation and transfer taxes if the conversion meets certain requirements. D.C. Code § 29-204.06(h).

The following facts appear to be undisputed. The Partnership, which was based in Virginia, owned a piece of real property in the District. On February 2, 2002, the Partnership and the LLC agreed to "Articles of Merger." The Articles of Merger referred to an attached "Agreement and Plan of Merger." The Articles of Merger provided that the Partnership adopted the Agreement and Plan of Merger pursuant to Section 50-73.128 of the Code of Virginia. That statute governed the merger of partnerships with, among other things, limited liability companies. Va. Code § 50-73.128 (2002). The Articles of Merger further provided that the LLC

adopted the Agreement and Plan of Merger pursuant to Section 13.1-1071 of the Code of Virginia. That statute applied to mergers involving limited liability companies. Va. Code § 13.1-1071 (2002); *see also id.* § 13.1-1070 (2002) (imposing requirements with respect to mergers involving limited liability companies).

The Agreement and Plan of Merger, which was dated February 4, 2002, provided that the Partnership was merging "with and into" the LLC. The merger transferred title to the D.C. property from the Partnership to the LLC. The Agreement and Plan of Merger did not specify any consideration for the transfer.

The Agreement and Plan of Merger stated that "[t]he LLC shall survive the Merger and shall continue to be a limited liability company" and that "[t]he separate existence of the Partnership shall cease." The Agreement and Plan of Merger provided that partnership interests would be "converted into" membership interests in the LLC and that "immediately following the Merger, each former partner of the Partnership shall have the same percentage ownership of the Surviving Entity as such partner previously held in the Partnership immediately prior to the Merger."

The Articles of Merger were filed with the Commonwealth of Virginia State Corporation Commission on February 7, 2002. On that same date, the Commission issued a Certificate of Merger recognizing that the Partnership merged into the LLC, "which continue[d] to exist," and that "the existence of each non-surviving entity

cease[d], according to the plan of the merger." At the time of the merger, LHL did not submit a deed or other writing to the ROD indicating that a transfer of real property had occurred and did not pay any taxes on the 2002 transfer.

In 2019, the LLC decided to sell the property to a third party. LHL therefore attempted to record a no-consideration deed that reflected the 2002 transfer of the property from the Partnership to the LLC. The 2019 deed described the Partnership as having "converted from a general partnership to a limited liability company" in 2002. LHL also submitted other documents to the ROD. After reviewing the documents, the ROD informed LHL that the 2002 transaction was a merger and that LHL therefore would need to pay recordation and transfer taxes in order for the ROD to accept the deed. Because no consideration had been paid for the transfer of the property, the ROD calculated the amount of taxes owed based on the property's fair market value as of 2019, when the deed was recorded. Under protest, LHL paid recordation and transfer taxes totaling approximately $6,000,000.

LHL filed an administrative claim for refund with the ROD, arguing that the 2002 transfer was not a taxable event. The ROD denied the claim, concluding that the 2002 transfer was a taxable event because a new and different entity owned the property after the transfer, the transaction documents characterized the Partnership as having merged with the LLC, and transfers caused by merger are taxable.

The ROD also upheld the calculation of the amount of the taxes owed. The ROD explained that the 2002 transfer was not for full consideration, and the regulations applicable to nominal-consideration transfers directed the ROD to look at the information "available [] *at the time of recordation* from which the market value of the property may be determined," such as the property's current assessed value or a certified appraisal not more than 6 months old. 9 D.C.M.R. § 502.10 (recordation tax; emphasis added); *see also id.* § 602.10 (transfer tax).

LHL sought review in the Superior Court. In February 2020, the District filed a motion to dismiss, and about a week later LHL filed an amended petition. In March 2021, the Superior Court denied the District's motion to dismiss, triggering the District's obligation to respond within thirty days to LHL's amended petition. Super. Ct. Tax R. 7(a)(1). The District did not timely file an answer. LHL initially did not seek any relief based on the District's failure to file an answer. Rather, the parties engaged in discovery and filed joint scheduling orders.

In January 2022, the District moved for leave to file an answer out of time, explaining that personnel changes had resulted in an inadvertent failure to file an answer to the amended petition. The court granted the motion, concluding that the District's failure to file a timely answer constituted excusable neglect. The court then granted summary judgment to the District, holding that the 2002 transfer was a

taxable event and that the ROD correctly calculated the taxes owed using the property's fair market value as of 2019.

## II. Analysis

## A. Standard of Review

"We review orders granting summary judgment de novo." *PHCDC1, LLC v. Evans & Joyce Willoughby Tr.*, 257 A.3d 1039, 1042 (D.C. 2021). "Summary judgment is only appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation modified). "We review the record in the light most favorable to the party opposing summary judgment." *Id.* at 1042-43.

We generally decide issues of statutory interpretation de novo. *Hershey v. Hershey*, 340 A.3d 1236, 1242 (D.C. 2025). The District argues, however, that the court should give "deference to the reasonable interpretation of the agency charged with implementing the statute, which in this case is" the Office of Tax and Revenue. *Bartholomew v. D.C. Off. of Tax & Revenue*, 78 A.3d 309, 316 (D.C. 2013); *Vornado*, 318 A.3d at 1189 (ROD is "part of the District's Office of Tax and Revenue"). LHL argues that the principle of deference that the District invokes was rejected by the Supreme Court in *Loper Bright Enterprises v. Raimondo*, 603 U.S.

369 (2024). The District responds that *Loper Bright* is not binding on this court and notes that, after the decision in *Loper Bright*, the D.C. Council codified the principle of deference. D.C. Law 26-37, § 2, 72 D.C. Reg. 8154 (2025) (codified at D.C. Code § 2-510(c)). LHL argues that *Loper Bright* is binding on this court and that the D.C. Council's enactment is unconstitutional and violates the Home Rule Act, which among other things precludes the D.C. Council from passing any law "with respect to any provision of Title 11 (relating to organization and jurisdiction of the District of Columbia courts)." D.C. Code § 1-206.02(a)(4). The District responds that the D.C. Council enactment is constitutional and consistent with the Home Rule Act.

We held this case in abeyance pending the decision in *Banks v. Hoffman*, 346 A.3d 665 (D.C. 2025) (en banc), which addressed the provision of the Home Rule Act that LHL relies upon. We also directed several rounds of supplemental briefing on the issue of deference. We conclude, however, that we need not resolve the dispute between the parties on that issue. Rather, we assume without deciding that our review is de novo, and we uphold the ROD's conclusions. *See generally, e.g.*, *Lane v. D.C. Dep't of Hous. & Cmty. Dev.*, 320 A.3d 1044, 1047 n.1 (D.C. 2024) (declining to decide implications of *Loper Bright* because court agreed with agency's interpretation "even without giving any deference to it").

**B. Taxable Event**

LHL argues that the 2002 transfer resulted from a non-taxable conversion rather than a merger. We hold that the 2002 transfer resulted from a merger.

In a merger, multiple distinct legal entities become one entity. D.C. Code § 29-202.01(a). The transfer of real property from one legal entity to another as part of a merger is a taxable event. *Vornado*, 318 A.3d at 1193 ("[T]ransfer and recordation taxes apply upon a transfer of property from one legal entity to another."). That is true even where the two entities involved are closely related and share common ownership. *Id.* at 1193-94. In *Vornado*, for example, we held that a merger between two closely related LLCs that resulted in a transfer of real property between two distinct legal entities was a taxable event, notwithstanding the taxpayer's argument that one of the LLCs was a wholly owned subsidiary of the other. *Id.* at 1196. We explained that the issue is one of business form rather than underlying ownership. *Id.* at 1193. We emphasized that parties who choose to structure their business affairs by creating distinct legal entities "must operate consistently and not seek treatment as individuals when that would better suit their interests in a particular setting." *Id.* at 1194 (citation modified).

We agree with the Superior Court that the 2002 transaction was a merger. It is undisputed that the 2002 transaction transferred title from one legal entity (the

Partnership) to another (the LLC). As described above, *supra* at 4, all of the contemporaneous documents indicate that both the LLC and the Partnership existed before the transaction and then merged, with the LLC being the entity that survived the merger. Moreover, the Plan of Merger cites Virginia Code provisions (Va. Code. Ann. §§ 13.1-1071 (2002), 50-73.128 (2002)) that governed mergers. Because the 2002 transaction merged two distinct legal entities and transferred property from one to the other, the transfer of property was a taxable event.

We are not persuaded by LHL's arguments to the contrary. First, LHL argues that the 2002 transaction was a non-taxable conversion. We disagree. A conversion is a single-entity event that occurs when an entity "convert[s] to a different type of entity." D.C. Code § 29-204.02(a). To effect a conversion, a statement of conversion must be signed by the converting entity and delivered to the Mayor. D.C. Code § 29-204.05(a). As we have explained, in the present case two legal entities merged into one. As the ROD noted, "in order for a transaction to qualify as a conversion, it must be shown that the owner of the property is the same entity both before and after the transfer." *See Vornado*, 318 A.3d at 1196 (holding that transfer between two distinct legal entities was not pursuant to conversion). LHL did not make that showing.

LHL attempts to rely on the fact that the word "converted" appears once in the Agreement and Plan of Merger, which provides that partnership interests will be "converted into" membership interests in the LLC. We are not persuaded by that argument. The Agreement and Plan of Merger refers to conversion of the interests of individuals, not to conversion of the Partnership into an LLC. As we have noted, *see supra* at 3-4, all of the references to the two legal entities in the Articles of Merger and the Agreement and Plan of Merger indicate that the two legal entities merged, not that one converted into the other.

LHL also argues that in fact the LLC did not pre-exist the 2002 transaction and instead came into being contemporaneously with that transaction, as was required by Virginia law. Our difficulty with this argument is that we see no evidence in the record to support the argument and substantial evidence pointing in the other direction. The LLC was signing documents before the Articles of Merger and the Agreement and Plan of Merger were submitted to the Commonwealth of Virginia State Corporation Commission. Those documents described a transaction in which the Partnership and the LLC merged, not a transaction in which the Partnership turned into an LLC that did not previously exist, and the Certificate of Merger described the Partnership as merging into the LLC, "which continue[d] to exist." As we have noted, "the burden shall be upon the taxpayer to show that a deed is exempt

from tax." D.C. Code § 42-1107 (recordation tax); *see id.* § 47-907 (transfer tax). LHL did not present evidence sufficient to carry that burden.

Second, LHL argues that the 2002 transaction is not taxable because the transaction was a conversion under Virginia law. We are skeptical that Virginia law would govern if it differed from the law of the District. We need not resolve that issue, however, because as we have noted, *supra* at 3-5, everything in the record indicates that the 2002 transaction was a merger under Virginia law as well as under District law.

Third, LHL argues that the 2002 transaction should be viewed as a conversion rather than a merger because of the way the transaction would be treated as a matter of federal tax law. As we have noted elsewhere, however, District tax law sometimes "differs in dispositive respects from federal tax law." *Sch. St. Assocs. v. District of Columbia*, 764 A.2d 798, 800 (D.C. 2001) (en banc). The issue before us is how the 2002 transaction should be treated under District law governing recordation and transfer taxes, not how the transaction might be viewed under various provisions of federal tax law.

Finally, LHL argues that the 2002 transaction is not taxable because the partners in the Partnership are identical to the members of the LLC. As previously noted, *supra* at 10-11, the fact that the owners of the two different legal entities are

the same is irrelevant. For purposes of the recordation and transfer taxes, the relevant inquiry is "legal ownership," not the identities of the individual owners. *Cowan v. D.C. Dep't of Fin. & Revenue*, 454 A.2d 814, 815 (D.C. 1983) (per curiam). The provisions at issue focus upon corporate form, and a transfer of real property from one legal entity to another is taxable. That "the participants in both business enterprises were similar [does] not recast [a transaction] into something other than a property transfer between two separate business entities." *Columbia Realty Venture v. District of Columbia*, 433 A.2d 1075, 1080 (D.C. 1981).

## C. Amount of Tax

If a transfer does not reflect payment of consideration, as in the present case, the recordation and transfer taxes "shall be based upon the fair market value" of the transferred real property. D.C. Code § 42-1104(a) (recordation tax); *see id.* § 47-904 (transfer tax). In this case, the ROD determined the amount of the taxes based on the fair market value of the property as of 2019, when the deed was recorded. LHL argues that the amount of the taxes should instead have been calculated using the fair market value as of the time of the transfer of the property in 2002. Although we view the issue as a close one, we conclude that the better view is that the amount of the taxes was properly based on the fair market value of the property as of 2019.

The applicable statutes do not provide an explicit time frame for the determination of fair market value. D.C. Code §§ 42-1104(a) (recordation tax), 47-904 (transfer tax). Several considerations, however, point in favor of using the fair market value as of the time of recordation.

First, we conclude that although recordation is required within thirty days of transfer, D.C. Code § 47-1431(a), the duty to pay the recordation and transfer taxes arises at the time of recordation, not at the time of transfer or at the time within which recordation was required. *See* D.C. Code §§ 42-1103(a)(1) (recordation tax: "At the time a deed . . . is submitted for recordation, it shall be taxed . . . ."), 47-903(a)(1) (transfer tax: "There is imposed on the transferor for each transfer at the time the deed is submitted to the Mayor for recordation a tax . . . ."); *In re Salas*, No. 18-00260, 2020 WL 3966952, at *2-4 (Bankr. D.D.C. July 13, 2020) (duty to pay recordation and transfer taxes arises upon recordation).

We note one apparent consequence of the conclusion that the duty to pay the recordation and transfer taxes does not arise until recordation, even if recordation was unlawfully delayed. It seemingly follows, as one bankruptcy judge has held, that the District is not entitled to interest on the taxes for the period of unlawful delay in registration. *See In re Salas*, 2020 WL 3966952, at *3 (denying interest on recordation and transfer taxes where deed had not yet been recorded; "those taxes

have not yet come due and interest will start to accrue only once the taxes come due upon recordation of the deed"). Nevertheless, we conclude that the plain language of the pertinent provisions establishes that the recordation and transfer taxes are not due to be paid until the time of recordation, even if recordation is unlawfully delayed.

That the duty to pay the taxes at issue arises at the time of recordation, rather than the time of transfer, does not definitively establish that the amount of the taxes should be based on the fair market value of the property at the time of recordation, rather than the fair market value as of the time of transfer. In our view, however, it is natural to infer, in the absence of an express provision otherwise, that the amount of a tax that arises on the occurrence of a given event (in this case, recordation) would be determined based on the circumstances that exist at the time of that event, rather than at the time of some earlier or later event. *Cf. generally Russo v. Borough of Carlstadt*, 17 N.J. Tax 519, 523 (Super. Ct. 1998) ("[V]aluation of real property for tax purposes begins with the well-settled premise that value is based upon the actual condition of the property as of the date of assessment.").

Second, determining historical fair market value can be quite a bit more challenging than determining current fair market value. *See, e.g.*, *In re Levy*, 256 B.R. 563, 566 (Bankr. D.N.J. 2000) (noting "additional expense and difficulty" if creditor were required to determine value of real property as of four years earlier).

We would not lightly infer that the legislature was imposing on the parties and the courts the task of trying to determine the historical fair market value of property that was transferred for no consideration. *Cf. State ex rel. Levine v. Bd. of Rev. of Fox Point*, 528 N.W.2d 424, 430 (Wis. 1995) ("Assessing the full value of real property that has not been sold in recent years is difficult at best, but calculating the past value of such property is a task too costly and burdensome to impose . . . .").

Third, tying the amount of the recordation and transfer taxes to the fair market value of the property at the time of recordation provides an incentive to timely record deeds. Under that approach, a party who fails to timely record a no-consideration deed runs the risk that the value of the transferred property will appreciate over time, thereby increasing the amount of tax eventually due. *Cf., e.g.*, *Ridgewood Dev. Co. v. Minnesota*, 294 N.W.2d 288, 292 (Minn. 1980) ("There is a tendency for the value of land to increase . . . .").

We note that the applicable regulations also support the conclusion that the amount of the recordation and transfer taxes should be based on the fair market value of the property at the time of recordation. Deeds that involve nominal consideration are also taxed on the basis of fair market value. D.C. Code §§ 42-1104(a) (recordation tax), 47-904 (transfer tax). In determining whether the consideration for a transfer is nominal, the ROD is permitted to consider, among other things, the

current assessed value of the property and a certified appraisal report that is not more than six months old. 9 D.C.M.R. §§ 502.10(a)-(b) (recordation tax), 602.10(a)-(b) (transfer tax). The regulations thus appear to reflect the view that fair market value is to be determined as of the time of recordation. We do not rely on the regulations, however, because as previously noted we are deciding this case on the assumption that the Office of Tax and Revenue is not entitled to any deference with respect to the interpretation of the statutes at issue. *See supra* at 7-8.

We acknowledge a significant factor that points in the direction of a conclusion that fair market value should be determined as of the time of the transfer: transfers that involve non-nominal consideration are taxed based on the amount of the consideration paid or required to be paid for the transfer, not based on the fair market value of the property at the time of recordation. D.C. Code §§ 42-1103(a)(1)(A) (recordation tax of 1.1 percent of consideration), 47-903(a)(1) (transfer tax of 1.1 percent of consideration). This feature of the provisions at issue has two consequences, in our view. First, it weakens the strength of the general inference that the amount of the recordation and transfer taxes would most naturally reflect the circumstances of the property at the time the duty to pay the taxes arises. Second, it means that disparities arise if no-consideration and nominal-consideration transfers are taxed in an amount that is based on the fair market value of the property at the time of recordation. If a property was transferred in 2020 for non-nominal

consideration of $1,000,000, then the combined recordation and transfer taxes would be $22,000, even if the deed was not recorded until 2027. D.C. Code §§ 42-1103(a)(1)(A) (recordation tax of 1.1 percent of consideration), 47-903(a)(1) (transfer tax of 1.1 percent of consideration). If the same property was transferred in 2020 for no consideration, or for nominal consideration, the combined recordation and transfer taxes could vary substantially depending upon the time and circumstances of the subsequent recordation. If the deed was recorded in 2027 and property values had increased by twenty percent between 2020 and 2027, for example, the combined taxes would be over $26,000. Conversely, if property values had (unusually) decreased by twenty percent over that time, the combined taxes would be less than $18,000. It is not obvious why the legislature would have wanted the amount of taxes owed to vary in these ways.

Although we are given pause by these considerations, on balance we nevertheless conclude that the better view is that the amount of the recordation and transfer taxes for transfers involving no or nominal consideration should be based on the market value of the property at the time of recordation. That approach has the strengths we have previously noted, *see supra* at 14-17, including that the parties and the courts will not be forced to try to determine the fair market value of property at a time that could be far removed from a transaction (in this case almost twenty years). Moreover, parties who wish to avoid the uncertainties and discrepancies that

might otherwise arise can do so by simply complying with their duty to timely record deeds transferring real property.

In sum, we hold that the amount of the recordation and transfer taxes for transactions that involve no or nominal consideration should be based on the market value of the property at the time of recordation.

## D. Untimely Filing of Answer

Finally, LHL challenges the trial court's ruling that the District's failure to timely file an answer to LHL's amended petition constituted excusable neglect. We hold that the trial court acted within its discretion.

A trial court "may, for good cause, extend the time [by which an act must be done] on motion made after the time has expired if the party failed to act because of excusable neglect." Super. Ct. Civ. R. 6(b)(1)(B); *see also* Super. Ct. Tax R. 3(a) (making Super. Ct. Civ. R. 6 applicable in Tax Division). "We review trial-court findings as to whether there was excusable neglect for abuse of discretion." *Gilliam v. D.C. Dep't of Forensic Scis.*, 343 A.3d 900, 903 (D.C. 2025).

Courts evaluating whether excusable neglect has occurred "should consider the danger of prejudice to other parties, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was

within the reasonable control of the movant, and whether the movant acted in good faith." *Gilliam*, 343 A.3d at 905 (citation modified) (applying test for excusable neglect from *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993)).

The trial court considered the applicable factors and concluded that (1) LHL had not asserted prejudice; (2) although the amount of the delay (nine months) was significant, the delay did not affect the proceedings because the parties moved forward with the case and the answer did not raise new issues; (3) the delay was within the District's reasonable control; and (4) in general, the District had been "responsible, engaged, and diligent, and there is no evidence that the District acted in bad faith." The trial court also noted that LHL did not initially seek any relief when the District failed to file a timely answer but rather participated without objection as the case moved forward and only raised the issue in opposition to the District's motion for leave to late file an answer.

We conclude that the trial court considered all of the applicable factors and reasonably concluded that on balance those factors favored a finding of excusable neglect.

We are not persuaded by LHL's arguments to the contrary. First, LHL argues that when a party misses an unambiguous deadline, excusable neglect cannot exist.

In support of that argument, LHL cites *Pioneer*, 507 U.S. 380. We see nothing in *Pioneer* supporting the existence of such a flat rule. We also see no reason why a flat rule of that type would be warranted. To the contrary, we have stated that "even a clear deadline may be enlarged for excusable neglect." *In re Est. of Yates*, 988 A.2d 466, 470 (D.C. 2010); *cf. Lynch v. Meridian Hill Studio Apts., Inc.*, 491 A.2d 515, 518 (D.C. 1985) ("[F]ailure to understand or observe court rules is [not] per se inexcusable neglect.") (citation modified).

Second, LHL argues that it was prejudiced because it has been ordered to pay the taxes at issue. The mere fact that judgment ultimately was entered against LHL, however, does not establish that LHL was prejudiced by the District's delay in filing an answer. In considering whether a party has been prejudiced by delay, we focus on whether the delay placed additional burdens on the opposing party, beyond the ordinary costs of litigation, or otherwise unduly impeded the opposing party's ability to respond on the merits. *Newton v. Grajny*, No. 24-CV-0654, 2026 WL 1338719, at *3 (D.C. May 14, 2026). We see no indication that LHL was prejudiced in any way by the District's late filing of an answer.

Finally, LHL argues that the District's failure to timely file an answer was within the District's own control, and that fact by itself precludes a finding of excusable neglect. We disagree. Control is only one of the four factors, and the trial

court reasonably found that on balance the factors weighed in the District's favor. Although LHL cites *In re Grooms*, 123 A.3d 976 (D.C. 2015), in support of the contention that control is the weightiest factor, we see nothing in *Grooms* supporting that contention. Rather, *Grooms* treated control as one of the four pertinent factors and found that all four cut against a finding of excusable neglect. *Id.* at 978-80.

In sum, the trial court acted within its discretion in finding that the District demonstrated excusable neglect.

For the foregoing reasons, we affirm the judgment of the Superior Court.

*So ordered.*